# 𝕴𝖓 𝖙𝖍𝖊 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘 𝖋𝖔𝖗 𝖙𝖍𝖊 𝕱𝖔𝖚𝖗𝖙𝖍 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

---

DARRELL J. AUSTIN, JR.,
*Plaintiff-Appellee*

v.

EXPERIAN INFORMATION SOLUTIONS, INC.,
*Defendant-Appellant*

---

On Appeal from the United States District Court
for the Eastern District of Virginia at Richmond
Case No. 3:22-cv-00707-REP (The Honorable Robert E. Payne)

---

## RESPONSE BRIEF OF PLAINTIFF-APPELLEE

---

LEONARD ANTHONY BENNETT
CRAIG CARLEY MARCHIANDO
DREW DAVID SARRETT
CONSUMER LITIGATION ASSOCIATES
763 J Clyde Morris Boulevard
Suite 1A
Newport News, VA 23601

MATTHEW W.H. WESSLER
GUPTA WESSLER LLP
2001 K Street NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
matt@guptawessler.com

JESSICA GARLAND
GUPTA WESSLER LLP
505 Montgomery Street, Suite 625
San Francisco, CA 94111

May 20, 2024                    *Counsel for Plaintiff-Appellee*

## CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellee Darrell J. Austin, Jr., is an individual that has no corporate parent and does not issue stock.

# TABLE OF CONTENTS

Corporate disclosure statement ............................................................... i

Table of authorities............................................................................ iii

Introduction ..................................................................................... 1

Statement of the issues ......................................................................4

Statement of the case ........................................................................4

Summary of the argument..................................................................15

Standard of review ...........................................................................20

Argument .......................................................................................21

    I.     The district court did not abuse its discretion in excluding
          Experian's conclusory and unsupported declaration ............................21

         A.     Experian bore the burden of establishing the existence
               of a binding contract under which Mr. Austin agreed to
               arbitrate this dispute with the company..................................... 22

         B.     Experian's sole declaration fell far outside the norm ................. 32

         C.     Experian's attacks on the district court's exercise of
               discretion to exclude the declaration fail.....................................38

    II.    Even if the Williams declaration was not excluded, Experian still
          failed to prove that Mr. Austin formed a contract ...............................46

Conclusion ......................................................................................53

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Kellogg USA, Inc.*,
674 F. App'x 496 (6th Cir. 2017) ........................................................ 35

*Antonio v. Barnes*,
464 F.2d 584 (4th Cir. 1972) ...................................................... 34, 36

*Arguelles v. U.S. Bulk Carriers, Inc.*,
408 F.2d 1065 (4th Cir. 1969) ........................................................ 34

*Berkeley County School District v. Hub International Ltd.*,
944 F.3d 225 (4th Cir. 2019) ........................................................ 23

*Berman v. Freedom Financial Network, LLC*,
30 F.4th 849 (9th Cir. 2022) ........................................................ 48

*Bryant v. Bell Atlantic Maryland, Inc.*,
288 F.3d 124 (4th Cir. 2002) ........................................................ 41

*Burwick v. Pilkerton*,
700 F. App'x 214 (4th Cir. 2017) .................................................... 40

*Catawba Indian Tribe of South Carolina v. South Carolina*,
978 F.2d 1334 (4th Cir. 1992) ................................................*passim*

*Corley v. Life & Casualty Insurance Co. of Tennessee*,
296 F.2d 449 (D.C. Cir. 1961) ........................................................ 40

*Cullinane v. Uber Technologies, Inc.*,
893 F.3d 53 (1st Cir. 2018) ...................................................... 23, 26

*Davis v. ConsumerInfo*,
2014 WL 12589134 (S.D. Fla. Sept. 10, 2014) .................................... 38

*Dillon v. Bay Cities Bank*,
2017 WL 11773670 (4th Cir. Apr. 6, 2017) ........................................ 31

*Dillon v. BMO Harris Bank, N.A.*,
173 F. Supp. 3d 258 (M.D.N.C. 2016) ............................................ 30

*Doza v. American National Insurance Co.*,
    314 F.2d 230 (8th Cir. 1963)................................................16, 25, 39

*Evans v. Technologies Applications & Service Co.*,
    80 F.3d 954 (4th Cir. 1996) ......................................24, 25, 34

*Foster v. Walmart, Inc.*,
    15 F.4th 860 (8th Cir. 2021) ..............................................48

*General Electric Co. v. Joiner*,
    522 U.S. 136 (1977)......................................................20

*Hayes v. Delbert Services Corp.*,
    811 F.3d 666 (4th Cir. 2016) ..............................................31

*In re Apex Express Corp.*,
    190 F.3d 624 (4th Cir. 1999) ..............................................42

*Kauders v. Uber Technologies, Inc.*,
    159 N.E.3d 1033 (Mass. 2021) ............................................48

*Lamonaco v. Experian Information Solutions, Inc.*,
    2024 WL 1703112 (M.D. Fla. Apr. 19, 2024) .................................3, 37

*MCB Ltd. v. McGowan*,
    359 S.E.2d 50 (N.C. Ct. App. 1987)........................................47

*Meyer v. Uber Technologies, Inc.*,
    868 F.3d 66 (2d Cir. 2017)................................................49

*Minnieland Private Day School, Inc. v. Applied Underwriters Captive Risk*
    *Assurance Co.*,
    867 F.3d 449 (4th Cir. 2017) ..............................................20

*Nader v. Blair*,
    549 F.3d 953 (4th Cir. 2008)..............................................44

*Nguyen v. Barnes & Noble, Inc.*,
    763 F.3d 1171 (9th Cir. 2014)..........................................23, 49, 51

*Nicosia v. Amazon.com, Inc.*,
    834 F.3d 220 (2d Cir. 2016) ......................................20, 48, 49, 52

*Northington v. Michelotti*,
    464 S.E.2d 711 (N.C. Ct. App. 1995)....................................................47

*O'Grady v. First Union National Bank*,
    250 S.E.2d 587 (N.C. 1978)...........................................................47

*Oberstein v. Live Nation Entertainment, Inc.*,
    60 F.4th 505 (9th Cir. 2023) .........................................................48

*Pecoraro v. Synovus Bank*,
    2023 WL 8525114 (S.D. Fla. Dec. 6, 2023) ....................................38

*Pecoraro v. Synovus Bank*,
    2024 WL 167391 (S.D. Fla. Jan. 16, 2024) ....................................38

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2d Cir. 2004) .........................................................22

*Rowland v. Sandy Morris Financial & Estate Planning Services, LLC*,
    993 F.3d 253 (4th Cir. 2021) ..................................................20, 22

*Sgouros v. TransUnion Corp.*,
    817 F.3d 1029 (7th Cir. 2016)................................................*passim*

*Specht v. Netscape Communications Corp.*,
    306 F.3d 17 (2d Cir. 2002)....................................................22, 23

*Spivey v. United States*,
    912 F.2d 80 (4th Cir. 1990) .........................................................36

*Starke v. SquareTrade, Inc.*,
    913 F.3d 279 (2d Cir. 2019) .........................................................49

*Stolt-Nielsen S.A. v. Animal Feeds International Corp.*,
    559 U.S. 662 (2010) ..............................................................15, 22

*Transo Envelope Co. v. Murray Envelope Co.*,
    227 F. Supp. 240 (D.N.J. 1964).....................................................35

*United States v. Hudson*,
    479 F.2d 251 (9th Cir. 1971) ........................................................25

*United States v. Iskander,*
    407 F.3d 232 (4th Cir. 2005) ................................................................20

*Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University,*
    489 U.S. 468 (1989) ..................................................................... 1, 22

## Statutes

15 U.S.C. § 1681 ................................................................................. 4

## Other Authorities

Charles A. Wright & Arthur R. Miller,
    Federal Practice and Procedure § 2738 (4th ed. 2023)...................16, 24

## Rules

Fed. R. Civ. P. 56 ...............................................................................16, 24

Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment .........................36

Fed. R. Evid. 602.................................................................................24

Fed. R. Evid. 602 advisory committee's note to 1972 proposed rules ......................24

# INTRODUCTION

The rules for how to prevail on a motion to compel arbitration are well established. Under a standard akin to summary judgment, the proponent of such a motion must show that, even after drawing all inferences in the other party's favor, there can be no genuine dispute of material fact as to the existence of a contract to arbitrate that party's claims. Requiring a company seeking to compel arbitration to meet this burden ensures that both sides mutually agreed to arbitrate. That is important because arbitration is, after all, "a matter of consent, not coercion." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989). And in the age of online contract formation—when no one signs a paper contract and where it's easy for a computer screen to change with just a few lines of code—it's especially important to establish exactly what a user saw when they accessed a company's website, and how that user's conduct on that website establishes that they unambiguously manifested their agreement to the contract.

In most cases, this burden is not particularly difficult to discharge. Companies large and small do it all the time—typically by introducing a declaration from a web developer or engineer who, by virtue of their role at the company or the documents they manage, can explain in precise detail how a particular user accessed the company's online interface, and how it was that, in doing so, the user manifested assent to a contract. Such an approach, courts have held, satisfies the "affirmative

showing" a declarant must make to show that they possess the knowledge they claim. *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1342 (4th Cir. 1992) (en banc).

But Experian failed to do that here. It has no contract with Mr. Austin, the consumer in this case, but it attempted to force Mr. Austin's Fair Credit Reporting Act claims into arbitration anyway. It did this by relying on contractual terms that, it claimed, Mr. Austin had supposedly agreed to with a different company, ConsumerInfo.com. All Experian offered to support its claim that Mr. Austin had, in fact, agreed to be bound by these terms, was the declaration of David Williams, a corporate vice president at ConsumerInfo.com. Mr. Williams asserted that Mr. Austin had completed a "webform" on the ConsumerInfo.com website and that, in doing so, he assented to binding contractual terms, including arbitration.

This declaration, however, was woefully inadequate. As the federal rules make clear, a declaration can only support a party's motion if the assertions are based on "personal knowledge." But Mr. Williams offered only a single boilerplate sentence to demonstrate personal knowledge here. He did not explain how his job responsibilities—which did not involve website development, maintenance, or management—would have equipped him with personal knowledge that Mr. Austin had visited and completed the particular webform. Nor did he explain how he had the requisite personal knowledge to speak to what the relevant ConsumerInfo.com interface would have looked like to a consumer in Mr. Austin's position at the time

Mr. Austin supposedly accessed the Consumerinfo.com website. To the contrary, although he claimed to have personal knowledge "based on a review of documents," he never identified what those documents were "so that the Court could test the merits" of his asserted knowledge. And although Mr. Williams claimed that, "if called upon to do so," he "could and would competently testify to the facts stated," he "explicitly declined" the district court's request that he do just that.

In the absence of any evidence that the relevant statements in Mr. Williams's declaration were based on his actual personal knowledge, the district court did not abuse its discretion in excluding it. Indeed, other federal courts have done the same thing when Experian has attempted to compel arbitration by relying on a similarly deficient declaration from Mr. Williams. *See Lamonaco v. Experian Info. Sols., Inc.*, 2024 WL 1703112, at *4 (M.D. Fla. Apr. 19, 2024) (excluding a similar affidavit because Mr. Williams "lacks personal knowledge" to support his "conclusory statements").

The district court therefore correctly denied Experian's motion to compel arbitration. Experian repeatedly refused to introduce any additional evidence to demonstrate—as it must—that Mr. Austin assented to binding contractual terms. And, even if Mr. Williams's declaration was sufficient, the design of the ConsumerInfo.com interface on which Experian relies fails to establish that Mr. Austin unambiguously assented to be bound by contractual terms. This Court should affirm.

## STATEMENT OF THE ISSUES

1. Whether the district court abused its discretion in excluding the only declaration Experian relied on to support its motion to compel arbitration because it failed to establish the requisite personal knowledge of the factual circumstances under which Mr. Austin purportedly formed a contract with ConsumerInfo.com.

2. Whether the district court correctly held that Experian failed to meet its burden of demonstrating that, based on the design of the ConsumerInfo.com interface, Mr. Austin provided unambiguous assent to binding contractual terms.

## STATEMENT OF THE CASE

**1.** Mr. Austin is a former bankruptcy debtor who used the bankruptcy process to discharge a number of outstanding debts in the hopes of getting back on his financial feet. JA20–23. After successfully navigating that process, and believing that his credit problems were behind him, Mr. Austin applied for new credit through a variety of financial institutions. JA23–24. But his applications were denied. JA24.

To find out why, Mr. Austin exercised his right under 15 U.S.C. § 1681j(a) to obtain free credit reports from each of the major consumer-reporting agencies, Equifax, Experian, and TransUnion. JA24. On those reports, he discovered that each of the agencies was reporting inaccurate and derogatory information about his discharged accounts. JA24–25. Experian, for instance, reported delinquent payments of thousands of dollars on one of the accounts that had been discharged in

bankruptcy. JA25–27. Mr. Austin attempted to dispute these flawed reports, but each of the consumer-reporting agencies repeatedly failed to properly investigate or address his concerns. *See* JA28–42. So he eventually filed this lawsuit, contending, among other things, that each of the consumer-reporting agencies violated the Fair Credit Reporting Act by failing to establish reasonable procedures to assure the maximum possible accuracy in the preparation of his reports, or to reasonably investigate disputed information. JA42–44. Equifax and TransUnion settled Mr. Austin's claims against them.

**2.** Experian, for its part, tried to force Mr. Austin's claim into arbitration. Experian conceded that it had never directly entered into a contract with Mr. Austin. JA100–103. Instead, it attempted to rely on a contract that, it claimed, Mr. Austin had entered into with a different company, ConsumerInfo.com—which was the company to which Mr. Austin was routed when he requested a free credit report. But to do that, Experian had to first prove that Mr. Austin had in fact formed a contract with ConsumerInfo.com in the first place—including proving that Mr. Austin had unambiguously assented to be bound by the contract's terms.

Perhaps because ConsumerInfo.com isn't a party to this case, the exact details of how it was that Mr. Austin purportedly came to form this contract remain unclear. The only evidence Experian was willing to submit in support of its motion was a declaration by David Williams, a "VP" of "Business Governance" at

ConsumerInfo.com. JA120. According to Mr. Williams, on May 3, 2020, Mr. Austin "enrolled" in a ConsumerInfo.com product called "CreditWorks." JA120. And according to Mr. Williams, "[i]n order to successfully" do so, Mr. Austin would have "had" to complete a particular webform. JA120–121, 125.

But Mr. Williams, whose day-to-day work at the company seems to involve high-level business operations like identifying corporate "risk[s]" and "regulatory" concerns, said little else. *See* JA533. He simply asserted that the scant facts in his declaration were "of [his] own personal knowledge," and stated that his knowledge had been "acquired in the course and scope of [his] job responsibilities" and "through the review of pertinent documents maintained as business records" by ConsumerInfo.com. JA120. But he did not explain how his job responsibilities enabled him to speak, with personal knowledge, to what services Mr. Austin had signed up for, let alone what Mr. Williams would have seen in doing so. And Mr. Williams did not attach or otherwise specifically identify which documents comprised his "review" other than to note that the review was limited to documents "relating to [ConsumerInfo.com's] internet advertising" and "sales of [ConsumerInfo.com's] credit products and services." JA120. Mr. Williams did not explain how those documents would have provided him with personal knowledge of Mr. Austin's purported sign-up process.

Instead, Mr. Williams asserted that his "duties" required him to "be familiar with … the marketing, advertising, and sales" of ConsumerInfo.com products. JA120. And he asserted that those "products" included "services that consumer[s] enroll in at Experian websites." JA120. But he did not identify which products those were, nor did he assert that he was familiar with the process of enrolling in any one of them. He did not explain what webpage or interface could have led Mr. Austin to the relevant webform—a page that says nothing at all about a "CreditWorks" product. He did not explain how he knew what the webform would have looked like at the specific date and time that Mr. Austin purportedly visited it. And he did not explain how he knew that Mr. Austin had completed the relevant webform—or what device, browser, or platform Mr. Austin had used to do so—leaving the reader to guess at how prominent the display would have been to a user in Mr. Austin's position.

Mr. Williams nevertheless asserted—without additional elaboration—that a "true and correct representation of th[at] webform" as "it would have appeared" when Mr. Austin "enrolled in CreditWorks" was attached to his declaration. JA121. The attached webform said nothing about a "CreditWorks" product. Rather, in keeping with ConsumerInfo.com marketing, it asked users to "Register Today" to obtain, among other things, the "Free Experian Credit Report" to which they are statutorily entitled. JA125. In small print toward the bottom of the page, the webform indicated that "[b]y clicking 'Create Your Account,'" "I accept and agree to your

Terms of Use Agreement" and authorize ConsumerInfo.com to do various other things, like "[p]rovide my credit report." JA125.

The following is an image of what Experian asserted the webform looked like:

**Tell Us About Yourself**

First Name     Last Name

Current Street Address     Apt, Unit

ZIP Code   City     State
Select

Have you lived at this address for 6 months or more?  ● Yes  ○ No

**Create Your Account**

Email Address     This will be your username

Password

What is the main reason you visited Experian today?
Please select an option

®Experian Boost results may vary. Some may not see improved scores or approval odds. Not all lenders use Experian credit files, and not all lenders use scores impacted by Experian Boost

Credit score calculated based on FICO® Score 8 model. Your lender or insurer may use a different FICO® Score than FICO® Score 8, or another type of credit score altogether. Learn more.

By clicking "Create Your Account": I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy and Ad Targeting Policy.

I authorize ConsumerInfo.com, Inc., also referred to as Experian Consumer Services ("ECS"), to obtain my credit report and/or credit score(s), on a recurring basis to:

- Provide my credit report (and/or credit score) to me for review while I have an account with ECS.
- Notify me of other products and services that may be available to me through ECS or through unaffiliated third parties.
- Notify me of credit opportunities and advertised credit offers.

I understand that I may withdraw this authorization at any time by contacting ECS.

Create Your Account

**When You Register Today, You'll Get:**

✓ Free Experian Credit Report and FICO® Score
✓ Increase your FICO® Score with Experian Boost®
✓ Report and Score Refreshed Every 30 Days On Sign In
✓ FICO Score Monitoring with Experian Data
✓ Experian Credit Monitoring and Alerts
✓ Free Dark Web Surveillance Report
✓ Credit Cards and Loans Matched for You

**Completely Free and Easy**
No purchase or credit card required. Checking your own credit will NOT hurt your credit scores.

**Safe and Secure**
The information you provide will be transferred to us through a private, secure connection.

Entrust SSL

McAfee SECURE

JA 125.

**3.** To uncover why or how Mr. Williams could attest to any of this, Mr. Austin sought discovery from Experian. He asked Experian to show that Mr. Williams actually had "any personal knowledge of what he's contending" in his declaration. JA446, *see also* JA410.

The district court granted Mr. Austin's request for discovery. Mr. Austin's attempt to learn how Mr. Williams could personally know about the things he included in his declaration, however, went nowhere. Experian objected to each and every interrogatory and request for production that Mr. Austin sent. JA409. It also pressed both general and "[p]rivilege" objections—without producing a privilege log—and it claimed the requests were "[b]urdensome[] and [dis]proportional[]" and "without any detail." JA409. As an example, Experian refused to provide discovery on its "method or process for determining whether" Mr. Austin had entered into a binding contract with ConsumerInfo.com, asserting that "there can be no serious dispute that this process" is privileged because it "would constitute work product." JA405–06.

The district court stepped in. It held that there was "no way [Experian] can meet [the requirements of] a work product protection [objection]." JA436. It likewise held that Experian "should have known" that its general objections were "improper," JA435, JA443, that the rules were "clear" that the failure to "file a privilege log" meant that any privilege objection was also improper, and that

Experian's proportionality objections were inappropriate without "any showing of what the proportionality objection is." JA435, JA441. The court also made it clear to Experian that if it continued with its "gamesmanship," the court would "enter an order that [Experian is] in default of all discovery because [it] ha[s] abused the process." JA443. The court then directed Mr. Austin to "be more precise" in some of his requests. JA419. Mr. Austin complied with the court's ruling and served "supplemental requests that were less complicated." JA475.

But despite "numerous phone calls a[s] well as email exchanges" between the parties, JA512, Experian continued its "inappropriate[] withholding [of] discovery materials," JA1803–04. Experian refused again to explain the basis for Mr. Williams's asserted personal knowledge about the "actual operation of the online system." JA1803–04. And it declined to identify the documents on which that knowledge could have been based. *See* JA1620–21. Other than Mr. Williams's "actual job description," Experian "failed to provide any further detail . . . during discovery" to "support [] the statements Williams made" in his declaration. JA1805–06. And when it supplied answers to some of Mr. Austin's interrogatories, it even asked a different person at ConsumerInfo.com—a "Director" of "Product Operations"—to certify those responses instead of Mr. Williams. JA1848.

In light of these repeated failures, Mr. Austin moved to exclude Mr. Williams's declaration and the district court agreed. JA510. Experian, the court explained, bore

the burden to prove that it was entitled to compel arbitration. JA1676. That burden imposed a standard akin to summary judgment, requiring Experian to show that, even after drawing all inferences in Mr. Austin's favor, there could be no genuine dispute of material fact as to whether ConsumerInfo.com secured mutual assent for its contract. JA1676. That requirement, in turn, meant that Experian had to rely on affidavits or declarations that had been made on personal knowledge. JA1677. And the Williams declaration did not adequately do so: Mr. Williams's job description did not "tend to show" any familiarity with the detailed contract-formation questions underlying Experian's motion, or with documents that could shed any light on precisely how Mr. Austin had purportedly formed a contract with the company. JA1680–84. As a result, Experian was left only with a "conclusory" assertion of personal knowledge that, the district court held, was too threadbare to carry Experian's burden, especially when Mr. Austin had supplied other evidence "cutting against" a finding of personal knowledge—including a LinkedIn page that described Mr. Williams's job duties as far afield from web interface management. *See* JA1684.

**4.** The exclusion of Mr. Williams's declaration left Experian with "no foundation" for its motion to compel. JA1690. But rather than deny the motion outright, the district court granted Experian's request to file a motion for "leave to supplement" its initial filing "with the evidentiary record" that it had produced during discovery. JA1692. The court also told Experian that if it chose not to make

that filing, it must provide notice to the court that "it did not intend to further supplement the record on the motion to compel." JA1807; JA1700.

Experian declined the opportunity to supplement the record. It filed a notice arguing that a supplemental motion was unnecessary because, in its view, the court had to consider the evidence Experian had produced during discovery, including its interrogatory responses and document production, and that that evidence, along with the exhibits to its initial motion to compel, fully satisfied its burden of proof. JA1704–06. Experian, however, did not provide the court with "specific citations to any of the purposed evidence in the record or discovery, which spanned over 800 pages," that it asserted provided the requisite support for its motion. JA1807–08. Nor did Experian "identify what documents Williams claimed to have relied on to have the personal knowledge that he claimed to have in" his declaration. JA1808. This "discovery dump" would, therefore, require the court to "ferret through hundreds" of pages and "pick out the parts" that supported Experian's "general statements." JA1712–25.

The court held that Experian's filing was improper. It explained that the filing failed to identify the evidence on which it relied and that Experian had refused to point the court to the specific pages, or even documents that Experian believed were relevant, which meant the court could not "possibly figure out" what "significance" Experian thought the evidence in the record possessed. JA1712–13; *see also* JA1716

(noting that in the district court's 31 years, it had "never seen this kind of offering in all of that time"). The "confusing presentation of information" would "necessitate a search of more than 800 pages of documents," "most of which seem[] to have little to do with the [relevant] issue[]." JA1733. And the lack of record cites made it "impossible to discern" coherent arguments on "the key issue, which is assent." JA1729.

Even so, the district court gave Experian yet another chance. At a conference in August 2023, the court told Experian it would permit a "replacement motion" that "detail[ed] [] the evidence in the record" that Experian "believe[s] substantiates the process through which" Experian has "a relevant arbitration agreement." JA1716–17. Experian told the court that it would be "happy" to "direct [the court] to specific citations in the record which will allow the Court to resolve the operative question." JA1724. The court then instructed Experian that this brief could not "contain[] unidentified evidence" or "require the Court to search through the 800 confusing documents" in the record. JA1808.

Experian, however, refused to follow through. The replacement memorandum Experian filed "was nearly identical to the original memorandum" Experian had filed earlier. JA1736, JA1809. It provided "no new support and relied entirely, once again, on the now excluded Williams Affidavit." JA1809. That was no accident. Experian explicitly rejected any "invitation[]" to correct its filing and add

record citations specifying the evidence it asserted supported its argument. JA1816. Instead, it asked the court to issue an order denying its motion to compel so that it could appeal "on the basis of [the court] excluding the Williams Affidavit." *Id.*; JA 1809, 1813.

After analyzing the evidence and arguments in Experian's "replacement" motion, the court again held that Experian failed to meet its burden. The court explained that, when Experian first filed its motion to compel, "it relied entirely on the Williams Affidavit to show the existence of mutual assent to arbitrate." JA1813. But that declaration was excluded because, "although Williams claimed to have personal knowledge based on a review of documents, those documents were not identified so that the Court could test the merits of the asserted personal knowledge claimed to be based on them." JA1813–14. And although "Williams swore that, 'if called upon to do so, I could and would competently testify to the facts stated'" in his declaration, "he explicitly declined the Court's request that he come to testify on those assertions." JA1815. The court, however, found that Mr. Austin had "provided an affidavit that, if believed, shows an absence of mutual assent to an agreement to arbitrate." JA1814. And since Experian failed to put forth admissible evidence that contradicted Mr. Austin's declaration, the court held that Experian "lacks sufficient evidence to provide that Austin agreed to the arbitration agreement on which Experian relies." JA1814.

The court also held that Experian's motion failed even if the Williams declaration was not excluded. The court explained that that declaration only detailed "the process that [Experian] used [to] lure[] consumers to [its] sister company's website for the purpose of allegedly receiving a free credit report," and how that process produced a contract containing the arbitration requirement at issue. JA1817. But, the court made clear, it is "not reasonable to believe that an average user would understand that by clicking [the relevant button] the consumer was agreeing to a service agreement which was both obscured and mislabeled." JA1817 (citing *Sgouros v. TransUnion Corp.*, 817 F.3d 1029 (7th Cir. 2016)). So, even if the interface was as described in the declaration, Experian still could not meet its burden to show that Mr. Austin mutually assented to the ConsumerInfo.com contract. JA1817. Accordingly, the court denied Experian's motion to compel. JA1820.

## SUMMARY OF THE ARGUMENT

**I.A.** Companies that want to prove they have formed an arbitration contract with their customers bear the burden of establishing the existence of a binding agreement to arbitrate. That's because a "party may not be compelled" to submit to arbitration "unless there is a contractual basis for concluding that the party *agreed* to do so." *Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp.*, 559 U.S. 662, 684 (2010).

This basic rule applies with no less force to efforts to enforce internet-based contracts. In that context, a company moving to compel arbitration must show that

a consumer engaged in some course of conduct online sufficient to demonstrate unambiguous assent to be bound by the contract. To make that showing, the basic summary judgment standards apply; so the company also must demonstrate that the evidence it relies upon to satisfy this burden is admissible. *See* Fed. R. Civ. P. 56(c)(1); Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2738 (4th ed. 2023). That means a company can rely on witness declarations only to the extent that those documents are "made on personal knowledge." Fed. R. Civ. P. 56(c)(4). And establishing personal knowledge of particular facts requires that the declarant specifically show how and why they "possess[] the knowledge asserted." *Doza v. Am. Nat'l Ins. Co.*, 314 F.2d 230, 232 (8th Cir. 1963). As this Court has put it, a declarant must make an "affirmative showing" that they possess the specific personal knowledge regarding the facts they claim to know. *Catawba*, 978 F.2d at 1342. As a result, a district court acts well within its discretion in excluding a proposed declaration that offers little more than conclusory statements regarding a declarant's personal knowledge of particular facts.

Companies seeking to enforce online contracts with consumers have long understood how to satisfy this burden. To demonstrate assent, they introduce a detailed declaration of a witness who can speak directly to what the consumer would have seen and done on the website based on the witness's personal knowledge. Typically, this declarant is an engineer, product manager, or technology officer.

Sometimes it's a corporate officer. But the hallmark of these declarants is that, through their job responsibilities, they possess direct personal knowledge of the specifics of the company's online platform or interface and the records on which the company is relying to show that a specific consumer visited and used the relevant site at a particular date and time. When faced with such a declaration, courts have routinely found the basic Rule 56 standards satisfied.

**I.B.** Unlike most companies, Experian did not rely on a declarant with that level of personal knowledge, or even one employed by Experian. The only evidence Experian produced to demonstrate that Mr. Austin unambiguously assented to certain contractual terms was a single declaration from a corporate vice president at a different company, ConsumerInfo.com.

Mr. Williams asserted, based on his "personal knowledge," that Mr. Austin "enrolled" in a webform on the company's site and stated that, to do so, Mr. Austin would have had to assent to a ConsumerInfo.com contract. To support this statement, Mr. Williams claimed that he had acquired personal knowledge of the relevant facts "in the course and scope of [his] job responsibilities and through the review of pertinent documents maintained as business records" by ConsumerInfo.com "in the course and scope" of its business. But he failed to explain how his job responsibilities—which involved internet "marketing," "advertising," and "sales" of ConsumerInfo.com "credit products" and "services"—gave him any

knowledge of the specific details of the company's online webform or Mr. Austin's use of it. And he did not attach or otherwise specifically identify which documents comprised his "review" other than to note that his review was limited to documents "relating to [ConsumerInfo.com's] internet advertising" and "sales of [ConsumerInfo.com's] products and services." Mr. Williams also did not explain how any of those documents would have provided him with personal knowledge of Mr. Austin's sign-up process. Given this, the district court did not abuse its discretion in finding the declaration failed to provide the requisite demonstration of personal knowledge and thus excluding it.

**I.C.** Experian's attacks on the district court's exercise of its discretion to exclude the declaration fail. Experian claims there are per se rules that permit it—along with any company—to rely on the declaration of any corporate officer so long as the declarant simply states that they possess "personal knowledge." But courts are clear that declarants must make an "*affirmative showing*" that they possess the personal knowledge to speak to the facts asserted. *Catawba*, 978 F.2d at 1342 (emphasis added). And despite repeated invitations by the district court, Experian chose not to provide any evidence substantiating Mr. Williams's assertion that he possessed the requisite personal knowledge.

Falling back, Experian attempts to rely on other documents produced during discovery. But it waived any reliance on that record below by explicitly declining the

district court's repeated invitation to specifically identify the relevant documents and evidence in the record to support its motion. And, in any event, none of that evidence discharges Experian's burden to show how Mr. Williams possessed the personal knowledge he claimed.

**II.** Even if the Williams declaration was not excluded, however, Experian still failed to prove that Mr. Austin assented to a contract with ConsumerInfo.com.

**A.** ConsumerInfo.com chose not to employ a standard "clickwrap" interface, which courts have long recognized is the best method to ensure that consumers can unambiguously provide assent to be bound to contractual terms. Instead, it used a website design that failed to clearly indicate to a consumer that, by clicking "Create Your Account," they were also assenting to be bound by an arbitration agreement.

**B.** Experian tries to distinguish ConsumerInfo.com's interface from the TransUnion interface invalidated by the Seventh Circuit in *Sgouros*, 817 F.3d at 1033. But many of the design choices that led the Seventh Circuit to find that TransUnion failed to demonstrate assent are equally appliable here. And none of the differences Experian identifies demonstrate that ConsumerInfo.com's interface was sufficient to obtain the requisite assent from Mr. Austin. Ultimately, Experian cannot show why the ConsumerInfo.com interface would allow a "reasonably prudent" user to know that, by clicking to create a free account, they were also assenting to a set of binding

contractual obligations, including arbitration. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 236–238 (2d Cir. 2016).

## STANDARD OF REVIEW

A district court's decision to exclude or admit evidence is reviewed for an abuse of discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141–42 (1977). This Court will not find such an abuse "unless [the district court's] decision was arbitrary and irrational." *United States v. Iskander*, 407 F.3d 232, 236 (4th Cir. 2005). And, as the Supreme Court has explained, "deference" is the "hallmark of abuse-of-discretion review." *Joiner*, 522 U.S. at 143.

A district court's decision as to whether an agreement to arbitrate was formed "is a question" that is reviewed "*de novo*." *Rowland v. Sandy Morris Fin. & Est. Plan. Servs., LLC*, 993 F.3d 253, 257 (4th Cir. 2021). To determine whether an agreement to arbitrate was formed, "the district court must employ the summary judgment standard." *Id.* "In applying that standard, the burden is on the defendant to 'establish[ ] the existence of a binding contract to arbitrate the dispute.'" *Id.* (quoting *Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co.*, 867 F.3d 449, 456 (4th Cir. 2017)).

**ARGUMENT**

## I. The district court did not abuse its discretion in excluding Experian's conclusory and unsupported declaration.

In support of its motion to compel arbitration, the only evidence Experian could muster was a declaration by Mr. Williams, a corporate vice president at a different company, ConsumerInfo.com. On its face, that declaration did nothing to explain how or why a corporate vice president responsible for "marketing, advertising, and sales" would possess the requisite personal knowledge of what the relevant ConsumerInfo.com webpages would have looked like at the specific date and time Mr. Austin purportedly visited the site, or of records establishing that Mr. Austin had, in fact, visited and completed the particular webform. The district court offered Experian multiple opportunities to rectify that problem, but the company repeatedly refused to do so. For example, Mr. Williams offered that, "if called upon to do so," he "could and would competently testify to the facts stated." JA120. But when the district court invited him to do just that, he "explicitly declined." JA1815. The district court did not abuse its discretion in excluding the declaration on this basis.[1]

---

[1] Unless otherwise noted, all internal quotation marks, citations, alterations, brackets, and ellipses have been omitted from quotations throughout this brief.

**A.  Experian bore the burden of establishing the existence of a binding contract under which Mr. Austin agreed to arbitrate this dispute with the company.**

**1.** Arbitration is "a matter of consent, not coercion." *Volt*, 489 U.S. at 479. As a result, a "party may not be compelled" to submit to arbitration under the Federal Arbitration Act "unless there is a contractual basis for concluding that the party *agreed* to do so." *Stolt-Nielsen*, 559 U.S. at 684. And that only exists when both parties to a purported contract have provided their "unambiguous manifestation" of assent to be bound. *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29–35 (2d Cir. 2002).

These fundamental rules of contract law apply no less for contracts purportedly made over the internet. Indeed, "[w]hile new commerce on the internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Rowland,* 993 F.3d at 260 (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004)). If anything, "the electronic age has not made the formalities of contract less crucial, but more so." *Id.* That is because, on the internet, companies routinely attempt to form contracts with consumers in new and unexpected ways. "Long gone are the days when two parties might sit down across a wooden table and sign with their own pens the same sheet of paper." *Id.* Instead of handing a consumer a piece of paper, companies doing business online typically propose contractual terms by supplying a link to the terms somewhere on their websites or application interfaces. *See, e.g., Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171,

1175–76 (9th Cir. 2014); *Cullinane v. Uber Techs.*, 893 F.3d 53, 56–59 (1st Cir. 2018). And instead of asking consumers to sign a document indicating their assent to those terms, companies opt to rely instead on a wide range of conduct—such that "a person using the Internet may not realize that she is agreeing to a contract at all." *Sgouros*, 817 F.3d at 1034–35.

So, when a company doing business online moves to compel arbitration, it bears the burden of specifically establishing that the consumer visited a particular website at a certain date and time and either clicked a particular button or engaged in some other course of conduct online that is sufficient to demonstrate that the consumer unambiguously assented to a binding contract. *See Rowland*, 993 F.3d at 258. And courts have insisted that a party seeking to compel arbitration must establish the existence of mutual assent under a standard akin to "summary judgment." *Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 234 (4th Cir. 2019). Under such a standard, the proponent must show that, even after drawing all reasonable inferences in the consumer's favor, there is no genuine dispute of material fact as to whether the company's online interface put the consumer on notice as to its proposed contractual terms and obtained their unambiguous assent. *Specht*, 306 F.3d at 29–35. In this way, the same basic summary-judgment standards apply: To demonstrate that there is no genuine dispute as to the formation of a contract, the proponent must

support that assertion by relying on admissible evidence in the record. Fed. R. Civ. P. 56(c)(1).

That evidence may consist of affidavits or declarations by knowledgeable witnesses—but only to the extent that those documents are "made on personal knowledge," "set out facts that would be admissible in evidence," and show that the declarant is "competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) ("Generally, an affidavit filed [on summary judgment] must present evidence in substantially the same form as if the affiant were testifying in court."). And because the burden on a motion to compel arbitration is on the moving party, the burden to show that these affidavits or declarations are admissible at trial also falls on the movant, with "[d]oubts as to the quality of the material" resolved against them. Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2738 (4th ed. 2023).

In this context, the requirements for establishing personal knowledge are both longstanding and familiar. At trial, a witness may testify to a matter "only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. This rule follows from the common law's historic insistence upon the use of "the most reliable sources of information." Fed. R. Evid. 602 advisory committee's note to 1972 proposed rules. The common law safeguarded that value by requiring any witness who sought to "testif[y] to a fact which can be

perceived by the senses" to "have had an opportunity to observe," and to actually *have* observed, that fact. *Id.* And the common law required, in turn, that the party intending to call such a witness has borne "the burden of laying a foundation" for the witness's personal knowledge "by showing that the witness had an adequate opportunity to observe" the relevant facts. *United States v. Hudson*, 479 F.2d 251, 256 (9th Cir. 1971) (quoting McCormick on Evidence § 10 (7th ed. rev. 2013)).

Consistent with this understanding, a declaration seeking to establish specific facts submitted at summary judgment or in support of a motion to compel arbitration must make an "affirmative showing" that the declarant possesses the specific personal knowledge regarding the facts they claim to know. *Catawba*, 978 F.2d at 1342; *Doza*, 314 F.2d at 232 (noting that a declarant must "show" that that they "possess[] the knowledge asserted"). A declarant who offers only "conclusory" statements regarding their personal knowledge, or premises their knowledge on inadmissible hearsay, will not meet this standard. *Evans*, 80 F.3d at 962. And where a declaration falls short of these basic requirements, a district court is well within its discretion to exclude it. *See id.*

**2.** Complying with these fundamental requirements is not typically difficult. Most companies take care to support a motion to compel arbitration with a detailed declaration signed by someone with direct experience of exactly what the relevant online interfaces looked like, and how those interfaces changed over time. That is

because their objective is not simply to show that at some point, in some manner, they were capable of forming a contract with one of its customers, but that the specific interface that the specific consumer saw would be sufficient to supply that consumer with conspicuous notice that a contract was being proposed, and that the consumer would have engaged in conduct on that interface that unambiguously manifested their assent to those terms. *Cullinane*, 893 F.3d at 62. And their objective is to do so by identifying admissible evidence through which they would be capable of discharging that burden at trial.

Take Uber. When the company wants to prove a contract was formed, it submits declarations from senior software engineers whose day-to-day job responsibilities "include oversight of the development, implementation, and maintenance of the Uber rider sign up process." Declaration of Christopher Brauchli in Support of Defendant Uber Technologies, Inc.'s Mot. to Compel Arbitration, Dkt. 27-1, *Cordas v. Uber Techs., Inc.*, No. 16-cv-4065 (N.D. Cal. 2017); *see also, e.g.*, Declaration of Paul Holden in Support of Uber's Mot. to Compel Arbitration, Dkt. 32-1, *Cullinane v. Uber Techs., Inc.*, No. 14-cv-147540 (D. Mass. 2016); Declaration of Vincent Mi in Support of Proposed Intervenor Uber Technologies, Inc.'s Mot. to Compel Arbitration, Dkt. 92-1, *Meyer v. Kalanick*, No. 15-cv-9796 (S.D.N.Y. 2016).

These declarations are detailed and comprehensive. The declarants explain their job responsibilities and identify why they are in a position to understand exactly

what a consumer would have seen on the company's web interface at a given date and time. *See, e.g.*, *Cullinane* Decl. ¶ 2 ("I am one of the developers on the iOS team, which designs and implements changes to the iOS software application (the "Uber App"). One of my job duties has been to design and implement the sign-up registration process for the Uber App."); *Meyer* Decl. ¶ 2 (similar); *Cordas* Decl. ¶ 2 (similar). They likewise explain the company's record-keeping practices, and how they were able to use their expertise to review those records to ascertain precisely when a given consumer visited the company's website. *See, e.g.*, *Cordas* Decl. ¶ 5 (explaining that "Uber maintains records regarding when and how its riders register, rider trip history, and rider transaction history"; that, "as an Engineering Manager," the declarant had "access to [those] records"; and that he was therefore able to "research[]" precisely when and how the user had created an account). And they explain how their research revealed what device the consumer employed when they visited the particular interface. *See, e.g.*, *Cordas* Decl. ¶ 5; *Meyer* Decl. ¶ 3.

In doing so, these declarants exhaustively demonstrate why they possess the personal knowledge to explain exactly what the company's web interface would have looked like to the user at the specific date and time the user visited the site. That includes the specific version of the interface the declarant's knowledge leads them to believe the user would have seen. *See, e.g.*, *Cordas* Decl. ¶ 6 (explaining that, based on a review of company records, the declarant "identified the version of the iPhone User

27

App that was in use" on the day the user purportedly signed up and that, "[a]s an Engineering Manager," he was "familiar with this version of the Uber App"); *see also Meyer* Decl. ¶ 3; *Cullinane* Decl. ¶ 6. It includes, among other things, the size and formatting of that interface and whether the consumer would have needed to scroll or click in order to find the relevant terms. *Cordas* Decl. ¶¶ 6–7; *Meyer* Decl. ¶¶ 5; *Cullinane* Decl. ¶¶ 7–15. And it includes screenshots or reproductions of the interface that the declarants could speak to, once again, by virtue of their roles at the company. *See, e.g.*, *Cordas* Decl. ¶¶ 6–7.

Other companies also follow this basic blueprint. Airbnb, for instance, has relied on a "product manager" whose role made him "familiar with the computer code that generates the platform and website pages maintained by Airbnb, including, but not limited to, the parts of the code that display[ed]" the company's "sign-up screens and consent events" on the various browsers and devices a consumer could have used to sign-up for the company's service. Declaration of Kyle Miller ¶ 1, Dkt. 13-2, *Selden v. Airbnb, Inc.*, No. 16-cv-00933 (D.D.C. 2021); *see also id.* at ¶ 3 ("I have personally reviewed archived and live portions of the Code relating to the sign-up screens and consent events utilized by Airbnb as discussed below."). Lyft has done much the same thing. *See* Declaration of Benjamin Lauizer in Support of Defendant Lyft, Inc.'s Mot. to Compel Arbitration ¶¶ 1, 6, Dkt. 16, *Wickberg v. Lyft, Inc.*, No. 1:18-cv-12094 (D. Mass 2018) (product manager and computer systems analyst who, in light

of those roles, is "familiar with Lyft's platform and mobile-phone application, including the driver sign-up and consent process"). Even much smaller companies know to support their motions to compel arbitration with declarations by similarly knowledgeable employees. *See, e.g.*, Declaration of Mitenkumar Bhandania in support of Mot. To Compel Arbitration ¶ 1, Dkt. 17-5, *Berman v. Freedom Fin. Network*, No. 18-cv-01060 (N.D. Cal. 2019) (declaration from "Computer System Engineer" noting familiarity with "structure and architecture" of company's online interface and its "user information" to base claim of personal knowledge).

Companies seeking to compel a customer to arbitration follow this approach because that's what it takes to discharge their burden on a motion to compel arbitration. Websites are complicated. How they appear to a user can depend on countless variables—from the time the user visits to the device they use to do so to the browser software installed on that device. Most of the people who work at an internet company aren't well-suited to explain how all those variables shake out—or how to interpret company records to answer these sorts of questions. By contrast, those responsible for creating, updating, or maintaining the interfaces can rely on their expertise to interpret and explain what those interfaces might have looked like at a given point in time.

Of course, companies sometimes rely on corporate officers for this purpose. But when they do so, they make sure that those officers can explain how their job

responsibilities place them in a position to possess the requisite personal knowledge to speak to the facts regarding a user's purported assent to relevant contractual terms. For instance, when Barnes & Noble sought to compel claims to arbitration, it didn't submit a declaration from its Chief Financial Officer or its Vice President of Human Resources. It submitted a declaration from its Chief *Technology* Officer, who was able to explain how, "in that capacity," he possessed the "ultimate[]" responsibility "for maintaining records regarding" the posting of terms and conditions on the Barnes & Noble website. Declaration of David Rowland in Support of Defendant Barnes & Noble, Inc's Mot. to Compel Arbitration ¶ 1, Dkt. 10-2, *Nguyen v. Barnes & Noble, Inc.*, No. 12-812 (C.D. Cal. 2015). He also explained how he was "familiar" not only with the "operation, functionality, and content" of the website, but also with "the order process" and the records that the company maintained regarding orders placed on its website—including the ability to verify that a given record accurately depicted exactly what a consumer would have seen on a particular time and date. *Id.*

When it comes to online contract formation, requiring a company to introduce the declaration of a witness who, drawing on direct personal knowledge of the relevant website and company records, can speak to exactly what the consumer would have seen and done on the website, given the time and manner in which they visited it, addresses the "special risks of fraud and error" that arise in the internet setting. *Dillon v. BMO Harris Bank, N.A.*, 173 F. Supp. 3d 258, 266 (M.D.N.C. 2016),

dismissed sub nom. *Dillon v. Bay Cities Bank*, 2017 WL 11773670 (4th Cir. Apr. 6, 2017). Since one party has exclusive control over the electronic records, that party—and that party alone—"is in a position to produce a document that meets its current preferences and needs." *Id.* And even in the absence of intentional fraud, there is an unavoidable "risk of error in the production of a document from the bowels of an electronic record-keeping system." *Id.* All the more so when a company's interfaces, terms and conditions, and record-keeping methods may change over time. *Id.*; *see also Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 670 (4th Cir. 2016) (arbitration contract changing over time).

What's more, each of these risks is "even higher when the party maintaining the records" is not the same party as the one that seeks to enforce the contract. *Id.* As a result, companies that have sought to rely on others' contracts have been particularly careful to introduce the declaration from a particularly knowledgeable witness. *See, e.g.*, Bhadania Affidavit ¶ 1, Dkt. 16-1, *Bell v. Royal Seas Cruises*, No. 19-cv-60752 (S.D. Fla. 2020) (Royal Seas Cruises filing affidavit by Fluent "Computer System Engineer" who is "responsible for System Maintenance and Tech Support" and is, through those rules, "familiar with the consumer facing websites operated by Fluent" and the company's "database of System and user information"); Klein Declaration ¶ 2, Dkt. 15-3, *Nicholas v. Wayfair Inc.*, No. 19-cv-1974 (E.D.N.Y. 2019) (corporate parent relying on declaration by "Director of Storefront Engineering" at

subsidiary company, who was responsible for "leading a team" of engineers who "build" the company's sites and apps); *see also* Klein Supp. Declaration, Dkt. 26, *Nicholas v. Wayfair Inc.*, No. 19-cv-1974 (E.D.N.Y. 2019), ¶¶ 3–4 (supplementing initial declaration with detailed account of "the records on which" the declarant initially relied, including a "clickstream report" illustrating exactly what the consumer purportedly did).

## B.  Experian's sole declaration fell far outside the norm.

Even though other companies have no trouble submitting declarations from engineers, product managers, or technology officers who possess direct personal knowledge of the hows and whys of their company's internet contracting, Experian declined to do so here.

The company couldn't introduce its own declarant because it never purported to form a contract with Mr. Austin on its own. Instead, it turned to a declarant who worked for a different company. JA120. That declarant described himself as a "VP" specializing in "Business Governance," JA120—meaning, apparently, that he identified and assessed "risk[s]" and "regulatory" concerns, worked with "regulatory agencies on review and corrective actions," and handled related business operations, JA533. Unsurprisingly, given his role, Mr. Williams did not purport to have any particular familiarity with how ConsumerInfo.com designed its web interfaces, how those interfaces appeared to particular consumers, or even why it was that the

company believed that Mr. Austin had formed a contract with it. JA120. Instead, he simply listed a date on which Mr. Austin purportedly "enrolled" in the company's product and described what Mr. Austin would have "had to" do "[i]n order to successfully" enroll. *Id.*

To explain how he knew any of these things, Mr. Williams offered a single boilerplate sentence: The facts in his declaration, he claimed, were "of my own personal knowledge," which "include[ed] knowledge acquired in the course and scope of my job responsibilities and through the review of pertinent documents maintained as business records" by ConsumerInfo.com "in the course and scope" of its business. JA120.

But Mr. Williams did not explain how "the course and scope of [his] job responsibilities" would have equipped him with "knowledge" of the date, time, or manner in which a particular consumer signed up for the CreditWorks service, let alone what the company's website would have looked like when they did so. And Mr. Williams did not explain what "pertinent documents" could have filled that gap. *Id.* He appended a few documents to his declaration, but those documents consisted solely of a "true and correct representation" of what Mr. Williams claimed was ConsumerInfo.com's webform "as it would have appeared" to Mr. Austin, and, similarly, "true and correct cop[ies]" of the Terms of Use that, he claimed, applied to Mr. Austin. JA121; *see* JA124–91. None of those documents supplied any insight into

how Mr. Williams could have known how or what Mr. Austin "had to" do on any of ConsumerInfo.com's webpages. *See* JA120.

The district court did not abuse its discretion in concluding that this vague boilerplate fell short of establishing that Mr. Williams possessed personal knowledge of the facts in his declaration. For starters, Mr. Williams's declaration was baldly conclusory, grounded on "unsupported assertions" that he possessed the "personal knowledge" to testify to the facts it contained. *Evans*, 80 F.3d at 962. And rather than "show[ing]" how or why he "possessed the knowledge asserted," *id.*, Mr. Williams rested on the unsupported claim that his personal knowledge of the asserted facts was based on knowledge he had acquired "in the course and scope of his job responsibilities" or "through the review of pertinent documents maintained as business records." JA120.

A district court acts well within its discretion in concluding that these types of vague statements do not satisfy Rule 56. As this Court has long explained, a declaration that "states only that [the declarant's] knowledge and information of the matters set forth 'were acquired by him in the course of his employment by said corporation'" does not, "without more," "meet even the minimum requirements" of Rule 56. *Arguelles v. U.S. Bulk Carriers, Inc.*, 408 F.2d 1065, 1068 (4th Cir. 1969); *see also Antonio v. Barnes*, 464 F.2d 584, 585 (4th Cir. 1972) (explaining why a similarly conclusory affidavit could not make the required "affirmative showing" of "personal

knowledge" regarding "specific facts"); *Alexander v. Kellogg USA, Inc.*, 674 F. App'x 496, 499 (6th Cir. 2017) (rejecting reliance on an affidavit that does not "expressly provide the basis for each assertion . . . beyond a vague reference" to the declarant's employment "position" because it "fails to provide information about the scope or responsibilities of her job that would allow us to presume knowledge on her part"); *cf. Transo Envelope Co. v. Murray Envelope Co.*, 227 F. Supp. 240, 242 (D.N.J. 1964) ("An affidavit which simply recites that the affiant has been 'apprised' of certain information, without more, is entitled to no weight.").

And make no mistake: neither Mr. Williams's description of his job responsibilities nor his reference to "pertinent documents" made the required "affirmative showing" that he could have had personal knowledge over Mr. Austin's sign-up process.

Start with Mr. Williams's job responsibilities. Mr. Williams claimed that his "duties" required him to "be familiar with" several corporate functions—specifically internet "marketing," "advertising," and "sales" of ConsumerInfo.com "credit products" and "services." JA120. None of these, however, have any apparent connection to the credit monitoring service for which Experian claims Mr. Austin signed up. JA120. Indeed, Experian has never claimed that the credit monitoring service—a free service Mr. Austin was routed into when he attempted to obtain a free credit report—was advertised, marketed, or sold to him. And even if it had,

possessing a general familiarity with how a product is advertised or sold does not confer personal knowledge over the specific sign-up process of a particular individual. *Antonio*, 464 F.2d at 585 (noting that statements regarding the "general routine" of an institution are insufficient to demonstrate "personal knowledge"). The district court did not abuse its discretion in finding these descriptions "too ambiguous" to support a showing of personal knowledge. JA1805.

The same is true of Mr. Williams's reliance on certain "pertinent documents." JA120. Mr. Williams completely failed to show what documents he relied on to support his claims that Mr. Austin had "enrolled" in ConsumerInfo.com's CreditWorks service, or the means by which Mr. Austin had done so—even though "materials referred to in an affidavit or declaration" are generally required to be "placed in the record." Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment. This meant that the district court could not "test the merits of" the personal knowledge Mr. Williams claimed. JA1814. Instead, all Mr. Williams did was reference documents that related to "internet advertising" and "sales." JA120. But he did not explain how or why those documents would have apprised him of the facts in his declaration. *See* JA120–21. And, as the district court recognized, to the extent Mr. Williams relied on these sorts of documents to establish the personal knowledge he claimed, those facts were hearsay. *See Spivey v. United States*, 912 F.2d 80, 85 (4th Cir. 1990) (hearsay affidavits are inadmissible). To be admissible at trial, Experian would

have had to show that these documents would be capable of admission into evidence under one of the hearsay exceptions.

Experian made no effort to do so. Just the opposite: Although Mr. Williams stated that, "if called upon to do so," he "could and would competently testify to the facts stated," he "explicitly declined" the district court's request to do just that. In both respects then, job responsibilities and pertinent documents, Mr. Williams's declaration fell well below the affirmative showing necessary to demonstrate personal knowledge of the key specific facts regarding Mr. Austin's purported sign-up.

Indeed, on this score, the district court here was not alone in concluding that a similar affidavit from Mr. Williams lacked the requisite personal knowledge to serve as evidence of a consumer's manifestation of assent to arbitrate. Just recently, another federal court rejected Experian's attempt to rely on an affidavit from Mr. Williams to support a motion to compel arbitration based on a consumer's alleged "enrollment" in ConsumerInfo.com. *See Lamonaco*, 2024 WL 1703112, at *1. There, as here, the court held that Mr. Williams' affidavit provided insufficient evidence that the consumer "assented to a clickwrap contract containing an arbitration agreement" "because Mr. Williams lacks personal knowledge of those conclusory statements." *Id.* at *4–5. The court recognized that "Mr. Williams describe[d] a general sign-up process that would appear, at first blush, to result in a binding clickwrap agreement upon completion." *Id.* at *4. But, "[b]y his own admission, Mr.

Williams lacks personal knowledge that [the consumer] completed the enrollment process for CreditCheck Total at all." *Id.* at *5. And just like here, although Mr. Williams claimed his knowledge was based on the company's business records, "Experian did not attach those alleged business records." *Id.*[2]

## C. Experian's attacks on the district court's exercise of discretion to exclude the declaration fail.

The district court here did not exclude Experian's declaration lightly. As the court repeatedly told Experian, to the extent the company had a genuine basis to establish Mr. Williams's personal knowledge, it could have filed a new submission substantiating his claims. And, to the extent the company wanted to rely on new evidence, the court urged Experian to collate and introduce that evidence properly for the court's evaluation. But Experian didn't want to have to explain how Mr. Williams possessed the personal knowledge he claimed. And the evidence uncovered in discovery was little help. So the company insisted that the court take the declaration as it was and then appealed when the district court excluded it.

---

[2] That other courts have allowed Experian to rely on Mr. Williams's declaration only demonstrates that the decision to exclude a particular proffer of evidence falls within a district court's broad discretion and is based on the particular context of each case. *See, e.g.*, *Davis v. ConsumerInfo*, 2014 WL 12589134, at *3 (S.D. Fla. Sept. 10, 2014); *Pecoraro v. Synovus Bank*, 2023 WL 8525114, at *2 (S.D. Fla. Dec. 6, 2023), *report and recommendation adopted*, 2024 WL 167391 (S.D. Fla. Jan. 16, 2024). And here, unlike in those cases, Experian repeatedly rebuffed the district court's requests to supplement the evidentiary basis of Mr. Williams's declaration. *See, e.g.*, JA435–43; JA1692; JA1815; JA1717–17.

On appeal, the main thrust of Experian's position is that the district court abused its discretion because it failed to apply a variety of per se rules that, Experian says, should immunize its declaration from any challenge. So long as a witness states that they possess "personal knowledge," Experian's logic goes, the declaration is sufficient, and a district court abuses its discretion in excluding it. Doubly so if the declarant is a corporate officer; Experian's theory is that *every* corporate officer can be presumed to possess personal knowledge of all of the company's activities. But that is not the law. And Experian's remaining complaints about the district court's decision-making process come nowhere close to demonstrating that the court abused its discretion.

**1.** For starters, there is no rule that a declarant establishes personal knowledge anytime they supply a "simple attestation" that they have personal knowledge, as Experian claims (at 15, 23–24). That tautological view runs contrary to this Court's recognition that a declarant must make an "*affirmative showing*" that they possess the personal knowledge to speak to the facts asserted. *Catawba*, 978 F.2d at 1342 (emphasis added); *Doza*, 314 F.2d at 232.

The cases Experian cites don't say otherwise. To the contrary, all they show is that whether a witness attests to such knowledge or not is largely beside the point. In one, *Burwick v. Pilkerton*, 700 F. App'x 214 (4th Cir. 2017), this Court held that such an attestation is not *necessary*, not that it is somehow sufficient. *See id.* at 216. And in

another, the Court simply explained that, in one way or another, an attestation could help establish a witness's personal knowledge. *See, e.g.*, *Catawba*, 978 F.2d at 1342 (noting that the explanation that a person was familiar with the "use and possession" of a particular piece of property over a particular window of time could help establish the witness's personal knowledge as to the purposes to which that property was devoted). But this Court has never held that an attestation, standing alone, is categorically sufficient. And that is hardly surprising. Decisions regarding the admission of evidence are left to a district court's discretion for a reason: Any inquiry into the sufficiency of a given piece of evidence is inherently context-specific. *See Corley v. Life & Cas. Ins. Co. of Tenn.*, 296 F.2d 449, 450 (D.C. Cir. 1961) (recognizing that the "[a]dmissibility of testimony sometimes depends upon the form in which it is offered, the background which is laid for it, and perhaps on other factors as well"). The personal knowledge requirement for a declaration is no exception.

**2.** Nor are district courts required to apply the blanket presumption that every corporate officer possesses personal knowledge of every fact concerning their business. *See* Experian Br. 24–25. As with any other evidentiary inquiry, this question, too, is inherently context-specific. It has to be. Consider the wide range of corporate roles. There is no reason to presume that a Chief Financial Officer or a Vice President of Human Resources is intimately familiar with a company's web interface,

just as there is no reason to presume that a CEO possesses personal knowledge of the precise details of the compensation package offered to a given employee.

Here, too, this Court has not held otherwise. Experian rests heavily on this Court's statement in *Catawba* that officers "ordinarily" have personal knowledge of the acts of their corporations. 978 F.2d at 1342. But that remark was made in passing to describe why a particular affidavit satisfied the personal knowledge requirement. *See id.* In making it, the Court did not purport to set forth a general rule that applies to all corporate officers, whatever the nature of their duties or the contents of their affidavits. Experian's other cases are just as unavailing. They, too, hew to the general rule that the admissibility of evidence is a contextual question. In *Bryant v. Bell Atlantic Maryland, Inc.*, 288 F.3d 124 (4th Cir. 2002), for instance, the Court rejected the argument that the mere fact that several corporate affidavits declined to specifically state that they were based on personal knowledge required those affidavits to be excluded. *Id.* at 135 n.9. But in doing so, the Court did not rest simply on the fact that they were corporate officers, as Experian's general rule would hold. Rather, it emphasized the fact that their affidavits "contain[ed] sufficient information" to establish that their statements were made with personal knowledge, "including a description" of their "job titles" and their "duties." *Id.*

It shouldn't be surprising that this Court has declined to adopt a presumption like Experian's. That is because such a presumption would not accord with the basic

purpose of the personal knowledge requirement. As we've explained, the requirement is intended to safeguard the reliability of court testimony. It embodies the basic principle that direct personal experience is more reliable than second- or third-hand knowledge. The corporate context doesn't make that principle less important. Indeed, to the extent a corporate officer possesses personal knowledge of a particular set of events involving their employer, it is likely that that knowledge was *not* acquired through direct observation, but rather through some combination of supervising the responsible parties, reviewing relevant documents, and interviewing direct witnesses. The requirement that a corporate officer declarant—or a witness—affirmatively show *why* they possess the personal knowledge they claim helps ensure reliability notwithstanding such a chain of events.

Of course, there could be some circumstances in which a person's role and responsibilities could strongly suggest that they possessed personal knowledge of a corporation's comings and goings. *See, e.g.*, *In re Apex Express Corp.*, 190 F.3d 624, 635 (4th Cir. 1999) (noting that the president of a "small business" had personal knowledge of its conduct). But a general rule to this effect, without regard to the sort of corporate officer a person purported to be, or the relationship between that role and the facts they spoke to, would disregard the basic reasons why the personal knowledge requirement exists in the first place.

And even if such a "presumption" were operative, it would not get Experian very far here. Even if it made sense to presume that a corporate officer can speak to the "acts" of their company, that's not what Mr. Williams purported to do. He purported to speak to the acts of someone else—Mr. Austin—and to what Mr. Austin would have seen on the company's platform. There is no reason to excuse Mr. Williams from the same obligation anyone else would have: to explain why or how he possessed personal knowledge of these facts. And there is likewise no reason to excuse Experian from making the same showing other internet companies have been required to make to meet the same burden. *See supra* Part I.A.2.

**3.** Deprived of its various presumptions, Experian's argument boils down to a disagreement with the way in which the district court exercised its discretion. The company doesn't dispute the ordinary criteria for personal knowledge. It accepts, for instance, that a witness's statements must "make clear" that they are "recounting [their own] experience." *See* Experian Br. 24. It admits that "conclusory" declarations are "insufficient." *Id.* And it explains that if a declaration is "detailed" enough, the declarant's personal knowledge may be "self-evident." *Id.* But those are precisely the criteria that the district court used to determine whether Mr. Williams's declaration made the affirmative showing necessary to establish personal knowledge.

In arguing that this amounted to an abuse of discretion, Experian makes two basic points. *First*, it says (at 29) that Mr. Williams's testimony is so "detailed" as to

be self-evidently premised on personal knowledge. Hardly. There is nothing particularly detailed about Mr. Williams's testimony. As we have explained, he just stated, in a conclusory manner, that Mr. Austin "enrolled" in CreditWorks, without any explanation of how or why he believed that to be the fact. And the rest of his testimony appears to be a set of unexplained inferences about what Mr. Austin would have "had" to do to achieve that result. What's more, nowhere does Mr. Williams explain *why* he knows any of these facts to be true.

*Second*, Experian insists that even if Mr. Williams did not have direct personal experience with any part of Mr. Austin's enrollment process, his review of the company's business records supplied the requisite personal knowledge. That is wrong. As courts have explained, a declarant who is the custodian of a company's records, or who testifies to their personal "familiar[ity] with the record-keeping practices of a business," may rely on those documents to establish their personal knowledge of the contents they contain. *Nader v. Blair*, 549 F.3d 953, 963 (4th Cir. 2008). But Mr. Williams did not purport to do either here. His declaration included no basis to conclude that he was either the "custodian" of ConsumerInfo.com records, or that he was "familiar" with ConsumerInfo.com's record-keeping practices. He just asserted that he consulted documents that the company "maintained as business records," without speaking to his own role in or familiarity with the company's record-keeping practices. JA120.

**4.** The deficiencies in Mr. Williams's declaration do not appear to be lost on Experian. The company can't help itself from recharacterizing Mr. Williams's testimony, asserting, as Mr. Williams never did, that he was specifically familiar with the "enrollment process" for the CreditWorks product. *See* Experian Br. 21, 29. And rather than rest on the declaration itself, Experian repeatedly resorts to the discovery record.

But there is a problem with those arguments: They are waived. The district court specifically told Experian that, because that record was voluminous, if it chose to move to compel arbitration based on the materials it unearthed in the discovery record, it was required to highlight precisely the evidence on which it was relying. *See* JA1728–30 (declining to comb through "800 pages or more of documents" to unearth Experian's evidence and requiring the company to file a new motion tabulating the relevant evidence). But Experian refused to do so. It explicitly waived reliance on any materials other than the Williams declaration. JA1743 (Experian declining to rely on "any other evidence" in support of its motion to compel arbitration). The district court did not, therefore, abuse its discretion in considering only those arguments Experian in fact presented to it.

Experian offers no reason why this Court should be the first to wade through evidence Experian refused to tabulate for the district court. And even if this Court were inclined to do so, that evidence does not carry Experian's burden to show that

Mr. Williams possessed the personal knowledge to testify to Mr. Austin's purported contract formation. At most, it shows various reasons why *Experian* believes that Mr. Austin formed a contract with ConsumerInfo.com—what, for instance, Experian sees as the "technological basis for determining" what Mr. Austin "would have seen" during his purported enrollment, or what it says is the "full set of data" for his enrollment session. *See* Experian Br. 32–33 (citing various evidence). But none of that evidence discharges Experian's burden to show why *Mr. Williams* possessed the personal knowledge to testify to the facts in his declaration.[3]

## II. Even if the Williams declaration was not excluded, Experian still failed to prove that Mr. Austin formed a contract.

The district court was also correct that, even with Mr. Williams's declaration, Experian still failed to satisfy its burden to show a contract was formed. That is because Experian cannot show that a consumer like Mr. Austin assented to a contract by creating an account on ConsumerInfo.com. ConsumerInfo.com chose

---

[3] In presenting this evidence, Experian belatedly introduced a witness whose job title suggests that he might have had greater personal familiarity with ConsumerInfo.com's interfaces and record-keeping systems. *See* JA1848 (turning to "Director of Product Operations" to verify interrogatory responses). But Experian never attempted to show that this witness possessed the requisite personal knowledge to present admissible testimony, nor did it otherwise attempt to rely on his testimony to prove contract formation. Experian instead relied exclusively on Mr. Williams. Of course, Experian's resort to another witness might suggest that others possessed greater familiarity with ConsumerInfo.com's systems than Mr. Williams did. But it does nothing to meet the burden Experian must meet to establish that Mr. Austin assented to ConsumerInfo.com's contract.

not to employ a standard "clickwrap" interface—which, as courts have long explained, ensures that consumers can unambiguously provide their assent to be bound to contractual terms. Instead, it used a website design that failed to clearly indicate to a consumer that, by clicking "Create Your Account," they were also assenting to be bound by a specific set of contractual terms, including arbitration.

**A.** Experian's attempt to enforce the ConsumerInfo.com contract fails, first and foremost, because it cannot demonstrate "one of the essential elements of every contract[:] mutuality of agreement." *MCB Ltd. v. McGowan*, 359 S.E.2d 50, 51 (N.C. Ct. App. 1987). This is an essential requirement in North Carolina, as it is elsewhere. *Id.* It follows "from the more general principle of contract that, in order that there may be a valid and enforceable contract between parties, there must be a meeting of the minds of the contracting parties upon all essential terms and conditions of the contract." *O'Grady v. First Union Nat'l Bank*, 250 S.E.2d 587, 594 (N.C. 1978). Parties "must assent to the same thing in the same sense." *Northington v. Michelotti*, 464 S.E.2d 711, 714 (N.C. Ct. App. 1995) (citing 1 Joseph M. Perillo, Corbin on Contracts § 2.8(a) (revised ed. 1993)). And this "[e]lemental principle[] of contract formation appl[ies] with equal force to contracts formed online." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 513 (9th Cir. 2023) (collecting cases).

For decades, courts have been clear about what companies need to do to obtain mutual assent to contractual terms proposed online. The "most

straightforward" method is through a so-called "clickwrap" agreement, "in which a website presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating 'I agree' in order to proceed." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). Clickwraps are the "easiest method of ensuring that terms are agreed to" on a website because they require the clearest manifestations of assent. *Nicosia*, 834 F.3d at 237–38; *see Foster v. Walmart, Inc.*, 15 F.4th 860, 863 (8th Cir. 2021) ("mutual assent is rarely an issue" for explicit clickwraps).

Although it is possible for websites to obtain assent to terms without employing a clickwrap, "it will be difficult for the offeror to carry its burden" without one. *Oberstein*, 60 F.4th at 514 (quoting *Kauders v. Uber Techs., Inc.*, 159 N.E.3d 1033, 1051 (Mass. 2021)). For companies that "[choose] not to employ a clickwrap" model of online contracting, "the contract-formation question" turns on the concept of "inquiry notice"—whether a "reasonably prudent" user "would know that the [contract terms] governed." *Nicosia*, 834 F.3d at 236–238. The application of these principles is a "fact-intensive inquiry"—and nowhere more so than in the world of internet- and app-based contracting. *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 76 (2d Cir. 2017). Whether a company obtained assent to its contract in these circumstances depends on what a consumer "said, wrote, or did and the transactional context" in which they "verbalized or acted," *id.* at 74, including "the design and content of the

relevant interface," *id.* at 75, the "[c]larity and conspicuousness" of the putative terms, *Nicosia*, 834 F.3d at 233, and the relationship between the terms and the conduct deemed to constitute assent to them, *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 293 (2d Cir. 2019); *see also Nguyen*, 763 F.3d at 1177. The closer a non-clickwrap "agreement resembles a clickwrap agreement," the "more willing [courts are] to find the requisite notice for constructive assent." *Nguyen*, 763 F.3d at 1176–77.

Despite this clear direction from courts about how companies can create binding contracts online, ConsumerInfo.com didn't bother to ensure consumers provided the requisite consent. Instead, the company routed consumers who requested a free credit report to a different webpage and instructed them to click a button to create an account to receive that credit report. JA125. The company did not tell them that, in doing so, they were also purportedly agreeing to binding arbitration with a broad set of affiliated entities. JA125.

Nor does the webpage ever ask consumers to unambiguously indicate their assent—by, for instance, clicking an "I agree" button—to any contract. To the contrary, it buries the hyperlink to its terms of use in a dense block of information that specifies various things the consumer must authorize the company to do. And that block of information, which does not reference an arbitration provision, could appear to a reasonable user to be the very terms to which the hyperlinked "terms of use agreement" is referring. *See Sgouros*, 817 F.3d at 1035.

**B.** Unable to show that its website mirrors that of regular clickwrap agreements, Experian focuses (at 48) on factual differences between its website and the TransUnion website that the Seventh Circuit invalidated in *Sgouros*, 817 F.3d at 1033. But the interfaces share important similarities, and the Seventh Circuit's reasoning for why TransUnion failed to demonstrate mutual assent is equally appliable here. And, in any event, the differences Experian identifies fail to demonstrate that ConsumerInfo.com's interface was sufficient to obtain the requisite assent from Mr. Austin.

**1.** To begin, both companies made similar design choices that undermine any evidence of assent. They both claimed a consumer's click on a button demonstrated assent to an arbitration agreement, but "[n]owhere did [either] button … call [the consumer's] attention to any arbitration agreement." *See Sgouros*, 817 F.3d at 1033. Both websites also placed a "block of bold text" below the terms related to the arbitration clause in a manner that "misleads the customer" about whether clicking "constituted his authorization" to that block of text instead. *Id.* at 1035. And, rather than use an "'I Accept' button that unambiguously pertains to that agreement," both companies instead "explicitly stat[ed] that a click on the button . . . served a particular purpose unrelated to the Agreement" at issue. *Sgouros*, 817 F.3d at 1036; *see also* JA125 (putting the words "Create Your Account" on the button). That design choice "distract[s] the purchaser" from any relevant contractual terms. *Id.* And it

undermines other evidence of assent because "where a website specifically states that clicking means one thing, that click does not bind users to something else." *Id.* at 1025.

**2.** But Experian's focus on factual differences between ConsumerInfo.com's website and Transunion's suffers from a more fundamental flaw: It fails to demonstrate that ConsumerInfo.com's customers manifested their assent to any binding terms. As we have explained, because ConsumerInfo.com chose not to use a standard clickwrap, the district court here was required to perform a fact-specific inquiry based "on the design and content of the website" to determine whether there was assent. *Nguyen*, 763 F.3d at 1177. After performing that inquiry, it correctly concluded that, given both the problematic features unique to ConsumerInfo.com, as well as those that the website shares with Transunion's, an objective consumer would not be aware they were assenting to any binding contractual terms.

That is true for a number of reasons. For example, the company could have easily asked a consumer to click to "accept" its terms and conditions; instead it only asked consumers to click to "Create Your Account." JA125; *see, e.g.*, *Nicosia*, 834 F.3d at 236–37 (noting that "[n]othing" about a "Place your order" button alone "suggests that additional terms apply"). The company also could have put its terms and conditions next to a button indicating assent; instead it buried the hyperlink in a block of text—spatially decoupling the notice from the button. JA125; *see, e.g.*, *Nicosia*,

834 F.3d at 236–37 (noting that "the presentation of terms is not directly adjacent to the 'Place your order' button so as to indicate that a user should construe clicking as acceptance"). ConsumerInfo.com could also have indicated the terms and conditions included an arbitration agreement; instead it placed the terms before a paragraph of text that might confuse a user into thinking that that paragraph contains the terms of use to which they are agreeing. JA125; *see, e.g.*, *Nicosia*, 834 F.3d at 237 (noting that the existence of "numerous other links on the webpage, in several different colors, fonts, and locations," "generally obscure[s] the message"). And finally, the company placed its notice of terms on the same page as other important information unrelated to its attempt to bind consumers to contractual terms. JA125; *see, e.g. Nicosia*, 834 F.3d at 237 (noting that "the presence of customers' personal address, credit card information, shipping options" on the same page is "sufficiently distracting so as to temper whatever effect the notification has").

In short, ConsumerInfo.com did not just reject the "easiest method of ensuring that terms are agreed to." *Nicosia*, 834 F.3d at 238. It chose to design its website in a manner that a "reasonably prudent" user would not know that, by clicking to create a free account, they were also assenting to a set of binding contractual obligations, including arbitration. *See id.* at 236–38.

**CONCLUSION**

This Court should affirm the district court's decision denying Experian's motion to compel arbitration.

Respectfully submitted,

*/s/Matthew W.H. Wessler*
MATTHEW W.H. WESSLER
GUPTA WESSLER LLP
2001 K St. NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

JESSICA GARLAND
GUPTA WESSLER LLP
505 Montgomery Street, Suite 625
San Francisco, CA 94111

LEONARD ANTHONY BENNETT
CRAIG CARLEY MARCHIANDO
DREW DAVID SARRETT
CONSUMER LITIGATION ASSOCIATES
763 J Clyde Morris Boulevard
Suite 1A
Newport News, VA 23601

May 20, 2024                    *Counsel for Plaintiff-Appellee*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 12,646, excluding the parts exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

May 20, 2024

*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler

**CERTIFICATE OF SERVICE**

I hereby certify that on May 20, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit by using the CM/ECF system.

May 20, 2024

*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler